**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>Plaintiff,<br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | **Court No. 26-02220** |

**PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the U.S. Court of International Trade, Plaintiff-Intervenor, the Government of the Republic of Korea, hereby moves for judgment on the agency record with regard to the U.S. Department of Commerce's ("Commerce") final results in *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 8,180 (Feb. 20, 2026) ("*Final Results*"), and accompanying Issues and Decision Memorandum. For the reasons explained in the accompanying brief, Plaintiff-Intervenor respectfully moves the Court to hold that the contested portions of the *Final Results* are neither supported by substantial evidence nor in accordance

with law. Plaintiff-Intervenor further moves the Court to remand this matter to Commerce for reconsideration consistent with the order and opinion of the Court.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Daniel M. Witkowski
Jooyoun Jeong
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel to the Government of the Republic of Korea*

Dated: September 9, 2026

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

| | | |
|---|---|---|
| HYUNDAI STEEL COMPANY,<br><br>Plaintiff,<br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | ) | **Court No. 26-02220** |

**ORDER**

Upon consideration of Plaintiff's and Plaintiff-Intervenor's Rule 56.2 Motions for Judgment on the Agency Record; Defendant's and Defendant-Intervenor's responses; Plaintiff's and Plaintiff-Intervenor's replies; and all other pertinent papers, it is hereby

**ORDERED** that Plaintiff's and Plaintiff-Intervenor's Motions are **GRANTED**;

**ORDERED** that the U.S. Department of Commerce's ("Commerce") final results in *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 8,180 (Feb. 20, 2026) ("*Final Results*") are neither supported by substantial evidence nor in accordance with law; and

**ORDERED** that the *Final Results* are remanded to Commerce for reconsideration consistent with the Court's order and opinion in this matter.

**SO ORDERED**.

Dated: ____________________
New York, NY

_________________________________
Judge Claire R. Kelly

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>Plaintiff,<br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>Plaintiff-Intervenor<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>NUCOR CORPORATION,<br><br>Defendant-Intervenor. | **Court No. 26-02220**<br><br>NONCONFIDENTIAL<br><br>Business Proprietary Information Removed from Page 11. |

**PLAINTIFF-INTERVENOR GOVERNMENT OF THE REPUBLIC OF KOREA'S BRIEF IN SUPPORT OF HYUNDAI STEEL'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Yujin K. McNamara
Daniel M. Witkowski
Jooyoun Jeong
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel to the Government of the Republic of Korea*

Dated: September 9, 2026

# TABLE OF CONTENTS


**TABLE OF CONTENTS** ........ i

**TABLE OF AUTHORITIES** ........ ii

**INTRODUCTION** ........ 1

**ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED** ........ 1

**STATEMENT OF ISSUES** ........ 1

**STATEMENT OF FACTS** ........ 2

**STANDARD OF REVIEW** ........ 2

**SUMMARY ARGUMENT** ........ 2

I. COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW ........ 3

A. Commerce's *De Facto* Specificity Analysis Suffers from the Same Fundamental Defects Repeatedly Identified by This Court ........ 3

1. Commerce Unlawfully Conflated Disparate with Disproportionate ........ 4

2. Commerce Must Consider the Industry Makeup of the Country at Issue as a Whole ........ 5

3. Commerce Arbitrarily Grouped Disparate Industries Together for the Purposes of Its Specificity Analysis ........ 7

B. The Broad Availability and Usage of Electricity Combined with the Existence of a Standard Pricing Mechanism Demonstrate that the Provision of Electricity Is Not Specific ........ 8

II. COMMERCE'S BENEFIT DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR IN ACCORDANCE WITH LAW ........ 10

**CONCLUSION** ........ 13

# TABLE OF AUTHORITIES

**Page(s)**

***Cases***

*Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) .................. 7

*Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .................................................................................................................. 6

*Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ................ 4, 5, 8

*Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) ................ 4, 5, 8

*Hyundai Steel Co. v. United States*, No. 23-cv-00211-CRK, 2026 Ct. Intl. Trade LEXIS 66 (May 18, 2026) ........................................................................................ 4, 5

*Hyundai Steel Co. v. United States*, No. 24-cv-00190-CRK, slip op. 26-90 (Aug. 11, 2026) ........................................................................................................ 4, 5, 12

*Mosaic Co. v. United States*, 774 F. Supp. 3d 1362 (Ct. Int'l Trade 2025) .................................... 9

*POSCO v. United States*, 794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) ................................ 4, 5, 8

***Statutes***

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................................... 2

19 U.S.C. § 1677(5A)(D)(iii)(III) ........................................................................................ 3

28 U.S.C. § 1581(c) ............................................................................................................ 2

***Other Authorities***

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, 1994 U.S.C.C.A.N. 4040 (Sept. 27, 1994) ...................................................... 6, 10

## INTRODUCTION

This brief is submitted on behalf of Plaintiff-Intervenor the Government of the Republic of Korea ("GOK") in support of Plaintiff Hyundai Steel Company's ("Hyundai Steel") Rule 56.2 motion for judgment upon the agency record relating to errors of law and fact committed by the U.S. Department of Commerce ("Commerce") in the 2023 administrative review of the countervailing duty ("CVD") order on Certain Cut-to-Length Carbon-Quality Steel Plate ("CTL plate") From the Republic of Korea. *See* Pl. Hyundai Steel's Mem. in Supp. of Rule 56.2 Mot. for J. on Agency R., ECF No. 29 ("Pl. Br.").

For the reasons explained by Hyundai Steel and those set forth in this brief, Commerce's *de facto* specificity and benefit determinations regarding the GOK's provision of electricity are not supported by substantial evidence or otherwise in accordance with law.

## ADMINISTRATIVE DETERMINATION SOUGHT TO BE REVIEWED

The GOK challenges certain aspects of Commerce's final results in the 2023 administrative review of the CVD order on CTL plate from Korea, published as *Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2023*, 91 Fed. Reg. 8,180 (Feb. 20, 2026) ("*Final Results*") (P.R.8), and accompanying Issues and Decision Memorandum ("*Final Results IDM*") (P.R.9).

## STATEMENT OF ISSUES

1. Whether Commerce's determination that the GOK's provision of electricity for less than adequate remuneration ("LTAR") was *de facto* specific is not supported by substantial evidence on the record or otherwise in accordance with law.

2. Whether Commerce's calculations of the benefit from the GOK's provision of electricity for LTAR are not supported by substantial evidence on the record or otherwise in accordance with law.

## STATEMENT OF FACTS

The GOK adopts Hyundai Steel's statement of facts. To the extent that additional facts not mentioned by Hyundai Steel are relevant to the GOK's arguments, they are discussed within the context of the arguments set forth in this brief.

## STANDARD OF REVIEW

The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c). The Court "shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## SUMMARY ARGUMENT

Commerce's *de facto* specificity determination regarding electricity for LTAR is not supported by substantial evidence on the record or otherwise in accordance with law. In reaching its *de facto* specificity determination, Commerce improperly equated disparate electricity consumption with disproportionate electricity consumption. Commerce ignored the fact that electricity is broadly available and widely used in Korea. Commerce further neglected to consider that electricity prices in Korea are determined by a standard pricing mechanism and that industrial customers are not treated differently from other customers. Rather, record evidence demonstrates that neither the mandatory respondents nor the steel industry consumed disproportionately large amounts of electricity.

Similarly, Commerce's determination of the supposed benefit from the GOK's provision of electricity is faulty. Commerce incorrectly included amounts related to unrecovered fuel costs in 2021 and 2022 in determining the cost recovery rate for Korean Electric Power Corporation's (KEPCO) sale of industrial class electricity during the POR. Those amounts should have been excluded from Commerce's cost recovery analysis because they were not related to KEPCO's

cost of production and distribution of electricity during the POR and were already accounted for in Commerce's prior administrative reviews.

## I. COMMERCE'S FINDING OF *DE FACTO* SPECIFICITY IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW

In its Final Results, Commerce determined that the GOK's provision of electricity was *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III) because the available electricity consumption data demonstrated that the steel industry along with two or three other industries consumed a disproportionately larger amount of industrial class electricity in Korea in comparison to the other industries operating in Korea. *Final Results IDM* at 19-27. Commerce's finding of *de facto* specificity is not supported by substantial evidence or otherwise in accordance with law.

### A. Commerce's *De Facto* Specificity Analysis Suffers from the Same Fundamental Defects Repeatedly Identified by This Court

"Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist: . . . (III) An enterprise or industry receives a disproportionately large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(III). Under this provision, Commerce cannot conclude that the GOK's provision of electricity to certain industrial users is *de facto* specific simply because some users consume more electricity than others.

As Hyundai Steel explained in its opening brief, Commerce has failed to demonstrate that the steel industry's electricity consumption was disproportionate, that is, "too large or too small in relation to something else." Pl. Br. at 12-18. Despite repeated guidance from this Court on this precise issue, Commerce continues to equate "disproportionate" with merely "disparate," while disregarding differences in industry characteristics and size that readily explain why there

would be disparity in electricity consumption. *See Hyundai Steel Co. v. United States*, 745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) ("*Hyundai Steel I*"); *Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) ("*Hyundai Steel II*"); *Hyundai Steel Co. v. United States*, No. 23-cv-00211-CRK, 2026 Ct. Intl. Trade LEXIS 66 (May 18, 2026) ("*Hyundai Steel III*"); *Hyundai Steel Co. v. United States*, No. 24-cv-00190-CRK, slip op. 26-90 (Aug. 11, 2026) ("*Hyundai Steel IV*"); and *POSCO v. United States*, 794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025).

1. <u>Commerce Unlawfully Conflated Disparate with Disproportionate</u>

The term "disparity" means "a noticeable and usually significant difference or dissimilarity," whereas "disproportionately" means "being out of proportion" or being "too large or too small in relation to something else." Disparity and Disproportionately Definitions, MERRIAM-WEBSTER DICTIONARY, https://www.merriamwebster.com/dictionary/; Disproportionately Definition, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/disproportionately. A "disparity", standing alone, does not establish specificity because differences among industries often reflect fundamental distinctions in their operations, size, or resource needs. By contrast, "disproportionately" requires a contextual assessment of whether a particular enterprise or industry (or groups thereof) receives a benefit that is excessive relative to an appropriate benchmark.

This Court has repeatedly recognized that distinction. As it explained, "{d}isproportionality requires that an enterprise or industry is favored in some way (*i.e.*, it receives more than its fair share)" and requires evidence that a group of industries "benefit more than would be expected, based on their usage given that the subsidy in question is designed to confer benefits on usage levels, or in relation to some other comparator." *Hyundai Steel I*, 745 F. Supp. 3d at 1353; *see also Hyundai Steel II*, 798 F. Supp. 3d at 1289; *Hyundai Steel III*, 2026 Ct.

Intl. Trade LEXIS 66 at *13-14; *Hyundai Steel IV*, slip op. 26-90 at *12-16; and *POSCO*, 794 F. Supp. 3d at 1410. Accordingly, "the disproportionality inquiry involves a case-by-case analysis which assesses benefits, not in relation to the benefits of others, but in relation to some other comparator depending on the circumstances." *Hyundai Steel I*, 745 F. Supp. 3d at 1351.

Commerce's analysis in the *Final Results* falls well short of that standard. *See Final Results IDM* at 24. Commerce compared the steel industry's electricity consumption to the average consumption of (1) the ten largest industries or (2) other industries operating in Korea. *Id.* at 25. Commerce also compared the electricity consumption of the steel industry and a handful of other large consumers to that of the remaining top industrial users. *Id.* But none of these comparisons demonstrates disproportionality. Instead, they merely show that some industries consume more electricity than others—*i.e.*, disparity.

These comparative analyses are the types of comparisons this Court has repeatedly rejected. As the Court explained, "{g}reater benefit alone does not equate with disproportionality." *Hyundai Steel II*, 798 F. Supp. 3d at 1291; *see also POSCO*, 794 F. Supp. 3d at 1410. This Court further reaffirmed that "disproportionality" is distinct from "disparity" because the former requires a comparison between the benefit received and some relevant attribute of the industry, whereas the latter merely compares the amount of benefit received by different industries. *Hyundai Steel II*, 798 F. Supp. 3d at 1289-90. By relying exclusively on cross-industry differences in electricity consumption, Commerce again evaluated disparity rather than disproportionality and therefore failed to satisfy the statutory standard.

2. <u>Commerce Must Consider the Industry Makeup of the Country at Issue as a Whole</u>

Commerce summarily dismissed the relevance of *Changzhou Trina Solar Energy Co. v. United States* ("*Changzhou Trina Solar*"), reasoning that the basis for the *de facto* specificity

finding in that case differed from the circumstances presented here. *Final Results IDM* at 26. In doing so, however, Commerce missed the central point of the decision. In *Changzhou Trina Solar*, this Court explained that Commerce is "under an obligation to compare the industries receiving the subsidy to the industry makeup of the country at issue as a whole" when evaluating *de facto* specificity. 352 F. Supp. 3d 1316, 1330 (Ct. Int'l Trade 2018). The Court further explained that this requirement exists to "avoid the imposition of countervailing duties in situations where, because of the ***widespread availability and use*** of a subsidy, the benefit of the subsidy is spread throughout an economy." *Id.* (citing Uruguay Round Agreements Act, Statement of Administrative Action ("SAA"), H.R. Rep. No. 103-316 at 930, 1994 U.S.C.C.A.N. 4040, 4242 (Sept. 27, 1994)) (emphasis added).

The GOK's provision of electricity is precisely the type of broadly available and widely used programs that Congress did not intend to countervail. Electricity is available throughout the Korean economy under a standardized pricing system and is consumed by enterprises across all sectors. *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Response to the Initial Questionnaire" at Exhibit E-9 (Aug. 14, 2024) ("GOK IQR") (C.R.152/P.R.148). Accordingly, the principles articulated in *Changzhou Trina Solar* apply with equal force here. Yet, Commerce failed to examine whether differences in electricity consumption merely reflect the diverse characteristics of industries operating within the Korean economy.

By concluding that it need not account for those differences, Commerce disregarded the very contextual analysis that this Court has repeatedly required. The size of enterprises and industries is an obvious and significant determinant of electricity consumption. Some industries simply operate on a much larger scale than others. It is therefore unsurprising that a large

industrial sector, such as steel, consumes more electricity than comparatively smaller industries. Large-scale industries employ more facilities, equipment, and personnel, and naturally require greater quantities of electricity to support their operations. As a result, substantial differences in electricity consumption may arise even when consumption levels are entirely proportionate to the size and operational needs of the industry in question.

Commerce nevertheless treated those differences in electricity consumption as evidence of disproportionality. That approach improperly conflates disparity with disproportionality, as discussed above. *See Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1369 (Ct. Int'l Trade 2001). Commerce has shown nothing more than that different industries consume different amounts of electricity, a fact that is neither surprising nor legally relevant for the disproportionality analysis absent evidence that the steel industry received more than its fair share of the alleged subsidy. Commerce identified no evidence showing that the steel industry's electricity consumption was excessive relative to its size, operational requirements, or any other appropriate benchmark. Instead, Commerce's analysis rests on the unsupported premise that industries of vastly different sizes and characteristics should consume comparable amounts of electricity and that deviations from that premise establish disproportionality. Because that premise is unreasonable and unsupported by the record, Commerce's conclusion that the steel industry received a disproportionately large amount of the alleged subsidy is not supported by substantial evidence and not in accordance with law.

3. <u>Commerce Arbitrarily Grouped Disparate Industries Together for the Purposes of Its Specificity Analysis</u>

In its *Final Results*, Commerce grouped the largest electricity consumers without explaining why it focused solely on the top three or four industries or why those particular industries constituted the relevant industries for its *de facto* specificity analysis. *Final Results*

*IDM* at 25. Instead, Commerce relied on 19 C.F.R. § 351.502(b) to assert that it was not required to consider the shared characteristics among enterprises or industries that receive a subsidy. *Id.*

As Hyundai Steel explained, this Court has repeatedly rejected Commerce's practice of grouping a handful of high-consumption industries and then concluding, without further analysis, that those industries collectively received a disproportionately large share of the alleged subsidy. *See, e.g.*, *Hyundai Steel I*, 745 F. Supp. 3d at 1353; *Hyundai Steel II*, 798 F. Supp. 3d. at 1291; and *POSCO*, 794 F. Supp. 3d at 1408. Those decisions recognize that Commerce cannot establish disproportionality merely by identifying industries that consume large amounts of electricity and aggregating them into a single group. Rather, Commerce must provide a reasoned explanation for why the selected industries constitute a meaningful comparator and why their electricity consumption demonstrates that they received more than their fair share of the alleged subsidy.

Commerce provided no such explanation here. It failed to identify any common characteristic that justified grouping these industries together, explain why other industries were excluded from the analysis, or demonstrate how the selected grouping supports a finding of disproportionality. As a result, Commerce's determination rests on an arbitrary selection of industries rather than a reasoned analysis supported by the record.

Accordingly, Commerce's decision to group the largest electricity consumers for purposes of its *de facto* specificity analysis is not supported by substantial evidence or otherwise in accordance with law.

**B. The Broad Availability and Usage of Electricity Combined with the Existence of a Standard Pricing Mechanism Demonstrate that the Provision of Electricity Is Not Specific**

In its *de facto* specificity determination, Commerce failed to account for the fact that electricity in Korea is broadly available and widely used throughout the economy and that the

GOK provides electricity under a standard pricing mechanism that applies regardless of company and industry. *See Final Results IDM* at 19-27. As Hyundai Steel explained, Commerce's misapplication of the specificity test in the *Final Results* yielded precisely the sort of "overreaching and indiscriminate type of specificity finding" that *Mosaic Co. v. United States* forecloses. 774 F. Supp. 3d 1362, 1382 (Ct. Int'l Trade 2025); *see also* Pl. Br. at 10-11. Contrary to Commerce's finding, record evidence demonstrates that electricity in Korea is available to any person upon request, such that it is widely available and used. *See* GOK IQR at 569-72 (C.R.167/P.R.156); Exhibit E-4 (C.R.155/P.R.148). Despite the clear directions by Congress and this Court, however, Commerce bluntly ignored that electricity was widely used by virtually everyone in the country and determined that the GOK's provision of electricity is *de facto* specific.

The fact that the GOK uses a standard pricing mechanism to set electricity tariff rates further supports the conclusion that the GOK's provision of electricity is not specific. Although a standard pricing mechanism does not preclude a finding of *de facto* specificity, it remains highly relevant to whether a subsidy is *de facto* specific to an enterprise or industry when the program at issue is generally available and widely used.

The distinguishing feature of the Korean electricity program is that electricity is not limited to discrete segments of the economy but rather is widely and uniformly available throughout Korea. GOK IQR at 572. Indeed, any person in Korea can have access to electricity, provided that they pay the applicable rates established under KEPCO's standard pricing mechanism. *Id.* at 571-72; Exhibit E-9. Access to electricity is therefore governed by generally applicable rate schedules rather than by any discretionary or preferential criteria targeting particular users or industries. The record further demonstrates that Hyundai Steel did not receive

preferential pricing. To the contrary, Hyundai Steel paid higher electricity rates than those charged to customers in other classifications, such as residential, educational, and agricultural. *Id.* at Exhibit E-9.

These facts underscore the fundamentally broad-based nature of Korea's electricity program and weigh against a finding of specificity. Where a utility service is made available economy-wide under transparent and generally applicable pricing schedules, the mere fact that an electricity-intensive industry consumes a greater volume of electricity does not establish that the program is specific within the meaning of the statute. Rather, such usage reflects differing operational characteristics and energy requirements of different industry, not preferential access to, or preferential treatment under, the electricity pricing regime. Electricity in Korea is not a "narrowly focussed {sic} subsid{y} provided to or used by discrete segments of an economy" that the specificity test is intended to identify as countervailable. SAA at 930, 1994 U.S.C.C.A.N. at 4243.

## II. COMMERCE'S BENEFIT DETERMINATION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR IN ACCORDANCE WITH LAW

In calculating the benefit allegedly conferred by the GOK's provision of electricity, Commerce erroneously failed to remove certain effects of KEPCO's cost pass-through tariff system. Specifically, Commerce included accumulated fuel costs from years preceding the POR—*i.e.*, 2021 and 2022—reasoning that those amounts were "incorporated into KEPCO's 2023 costs and thus reflect the ability of KEPCO to be profitable in the POR." *Final Results IDM* at 17-19. As Hyundai Steel explained, however, these amounts do not represent actual costs incurred by KEPCO during the POR and bear no relationship to KEPCO's cost of supplying electricity, and thus its actual profitability on its sale of electricity, during that period. Rather, they represent amounts incurred in prior years that KEPCO was unable to charge to

customers due to limitations imposed by the Fuel Cost Adjusted Charge ("FCAC"). Pl. Br. at 20-24.

The GOK further clarifies Hyundai Steel's arguments by explaining the distinction between FCAC and FCAC pass-through amount, which lies at the center of this dispute. The FCAC is a charge KEPCO imposes on its customers, adjusted quarterly to reflect fluctuations in fuel prices that affect KEPCO's electricity purchase price. GOK IQR at Exhibit E-2, pp. 5-6 (C.R.155/P.R.149). It allows KEPCO to adjust customer charges more promptly than would be possible through the annual rate-setting process. However, as Hyundai Steel explained, under the applicable tariff, the FCAC should be within the range of ±5 KRW/kWh. *See* Pl. Br. at 20-21; *see also* GOK IQR at 20 (C.R.168/P.R.157).

To illustrate, if an increase in fuel prices would justify an FCAC at 7 KRW/kWh for a given quarter, the applicable cap limits the FCAC charged to customers to 5 KRW/kWh. Thus, although the increase in fuel prices would otherwise result in an FCAC of 7 KRW/kWh for that quarter, KEPCO could recover only 5 KRW/kWh through the FCAC for that quarter. The unrecovered 2 KRW/kWh may subsequently be considered in establishing the following year's electricity rates, including the base charge and power demand charge. This constitutes the FCAC "pass-through."

As a result, while the unrecovered 2 KRW/kWh reflects costs arising from the previous year's increase in fuel prices, the cost pass-through tariff system allows KEPCO to account for these costs again in the following year as part of the "**[**

**]**" component in KEPCO's 2023 Total Comprehensive Cost. Letter from Yoon & Yang LLC to Sec'y Commerce, "Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Response to the Supplemental

Questionnaire" at 4; Exhibits E-21 and E-22 (Feb. 18, 2025) ("GOK SQR") (C.R.55-56/P.R.82-83). It is important to note that this component is recorded as a separate line item, distinct from KEPCO's operating cost and expenses, further supporting the conclusion that the pass-through amount does not constitute an operating cost. *See* GOK SQR at Exhibit E-23 (C.R.52/P.R.82).

The FCAC pass-through is relevant solely to the annual rate-setting process and is distinct from the FCAC itself, which appears as a separate line item on customer bills and is adjusted quarterly. While the pass-through amount may be used by KEPCO to justify a higher base charge and power demand charge for ratemaking purposes, it does not reflect an additional cost that is incurred by KEPCO for procuring and supplying electricity during the POR. Commerce in fact conceded that these were not costs from the POR, describing the amounts as "accumulated portions of fuel costs from 2021 and 2022" and "the 2021 and 2022 fuel costs, which were not passed along to electricity consumers in those years." *Final Results IDM* at 18-19. By including the FCAC pass-through amount in its benefit calculation, Commerce effectively double counted amounts that had already been accounted for in the cost-recovery analyses conducted in the 2021 and 2022 administrative reviews and impermissibly applied countervailing duties multiple times for the same failure to recover costs in 2021 and 2022. *See Hyundai Steel IV*, slip op. 26-90 at *31-32.

Accordingly, Commerce's inclusion of the effects of the cost pass-through tariff system in its benefit calculation is not supported by substantial evidence on the record or otherwise in accordance with law.

**CONCLUSION**

For the reasons discussed above, Commerce's *Final Results* are not supported by substantial evidence or otherwise in accordance with law.

Respectfully submitted,

/s/ Yujin K. McNamara
Yujin K. McNamara
Daniel M. Witkowski
Jooyoun Jeong
Sung Un K. Kim
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com

Dated: September 9, 2026

*Counsel to the Government of the Republic of Korea*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that the foregoing Memorandum in Support of Hyundai Steel's Rule 56.2 Motion for Judgment on the Agency Record, complies with the word-count limitation set forth in the Court's June 25, 2026 Scheduling Order. The Memorandum of law contains 3,499 words according to the word-count function of the word-processing software used to prepare the memorandum.

Respectfully submitted,

/s/ Yujin K. McNamara

Yujin K. McNamara
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street NW
Washington, DC 20006
Phone: (202) 887-4347
E-mail: ymcnamara@akingump.com
*Counsel to the Government of the Republic of Korea*

Dated: September 9, 2026