**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

HYUNDAI STEEL COMPANY,

*Plaintiff,*

and

GOVERNMENT OF THE REPUBLIC OF KOREA,

*Plaintiff- Intervenor,*

v.

THE UNITED STATES,

*Defendant,*

and

NUCOR CORPORATION,

*Defendant-Intervenor.*

Consol. Court No. 26-02220

**ORDER**

Upon consideration of the plaintiffs' Rule 56.2 motions for judgment on the agency record, defendant's opposition, and all other pertinent papers, it is hereby

ORDERED that the motions for judgment on the agency record are denied; and it is further ORDERED that judgment shall issue for the United States.

Dated: ____________________
New York, New York

____________________
JUDGE

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

HYUNDAI STEEL COMPANY,

*Plaintiff,*

and

GOVERNMENT OF THE REPUBLIC OF KOREA,

*Plaintiff-Intervenor,*

v.

THE UNITED STATES,

*Defendant,*

and

NUCOR CORPORATION,

*Defendant-Intervenor.*

Consol. Court No. 26-02220

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

JONATHAN D. GUYNN
Acting Assistant Attorney General
PATRICIA M. MCCARTHY
Director
TARA K. HOGAN
Assistant Director
MATTHEW D. LEWIS
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
(202) 880-6321

OF COUNSEL

BRAHIM SLEIMAN
U.S. Department of Commerce
Office of the Chief Counsel for Trade Enforcement and Compliance
Litigation Branch
1401 Constitution Avenue
Washington, D.C. 20230

# TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 .......... 2

I. Administrative Determination Under Review .......... 2

II. Issues presented for Review .......... 2

STATEMENT OF FACTS .......... 3

SUMMARY OF THE ARGUMENT .......... 7

ARGUMENT .......... 9

I. Standard of Review .......... 9

II. Commerce's Determination that KEPCO's Provision of Electricity for LTAR Is *De Facto* Specific Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law .......... 10

A. Legal Framework .......... 10

B. Substantial Evidence Supports Commerce's Determination That the Steel Industry Consumed A Disproportionately Large Amount of the Subsidy .......... 12

C. Commerce's Determination to Group Certain Industries for Purposes of Its Disproportionality Analysis is Reasonable .......... 18

D. Commerce Calculation of the Benefit for the Electricity for LTAR Program Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law .......... 20

CONCLUSION .......... 24

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*AK Steel Corp. v. United States*,
192 F.3d 1367–85 (Fed. Cir. 1999) .......... 11, 12, 13, 16

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) .......... 10

*Bethlehem Steel Corp. v. United States*,
140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) .......... 15, 16

*Canadian Solar v. United States*,
537 F. Supp. 3d 1380 (Ct. Int'l Trade 2021) .......... 23

*Changzhou Trina Solar Energy Co. v. United States*,
352 F. Supp. 3d 1316 (Ct. Int'l Trade 2018) .......... 17

*Consolidated Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 9

*Consolo v. Fed. Mar. Com.*
383 U.S. 607 (1966) .......... 10

*Gov't of Quebec v. United States*,
105 F.4th 1359 (Fed. Cir. 2024) .......... 11

*Hyundai Steel Co. v. United States*,
745 F. Supp. 3d 1345 (Ct. Int'l Trade 2024) .......... 10-11, 13

*Hyundai Steel Co. v. United States*,
798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) .......... 13

*Hyundai Steel Co. v. United States, No. 24-00190*,
2026 WL 2585633 (Ct. Int'l Trade Aug. 11, 2026) .......... 20

*Mosaic Co. v. United States*,
160 F.4th 1340 (Fed. Cir. 2025) .......... 11, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*,
463 U.S. 29 (1983) .......... 20

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .......... 10

*POSCO v. United States*,
794 F. Supp. 3d 1402 (Ct. Int'l Trade 2025) .......... 15, 19

*Royal Thai Gov't v. United States*,
436 F.3d 1330 (Fed. Cir. 2006) .......... 11

*Samsung Electronics Co. v. United States*,
973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) .......... 16

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) .......... 9

*Uttam Galva Steels Ltd. v. United States*,
311 F. Supp. 3d 1345 (Ct. Int'l Trade 2018) .......... 24

**Statutes**

19 U.S.C. § 1677 .......... *passim*

19 U.S.C. § 1516a(b)(1)(B)(i)§ 1516a .......... 9

**Rules**

Rule 56.2 .......... 1

**Other**

19 C.F.R. § 351.502 .......... 18, 19

19 C.F.R. § 351.511 .......... 5, 21, 23

19 C.F.R. § 351.525 .......... 3, 4

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE CLAIRE R. KELLY, JUDGE**

| | |
|---|---|
| HYUNDAI STEEL COMPANY,<br><br>*Plaintiff,*<br><br>and<br><br>GOVERNMENT OF THE REPUBLIC OF KOREA,<br><br>*Plaintiff-Intervenor,*<br><br>v.<br><br>THE UNITED STATES,<br><br>*Defendant,*<br><br>and<br><br>NUCOR CORPORATION,<br><br>*Defendant-Intervenor.* | Consol. Court No. 26-02220 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'**
**MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by Plaintiffs Hyundai Steel Company (Hyundai Steel) and the Government of the Republic of Korea (GOK) challenging the final results of the Department of Commerce's administrative review of the countervailing duty (CVD) order covering certain cut-to-length quality steel plate (CTL plate) from the Republic of Korea. *See* Hyundai Steel's Motion for Judgment on The Agency Record, ECF No. 29;30. (Hyundai Br); *see also* Government of the Republic of Korea's Motion

for Judgment on The Agency Record, ECF No. 31;32 (GOK Br.). Specifically, Hyundai Steel and GOK challenge: (1) Commerce's determination that the GOK's provision of electricity for less than adequate remuneration (LTAR) was *de facto* specific and (2) Commerce's calculation of the benefit from the provision of the electricity for LTAR program. As we demonstrate below, Commerce's determination is supported by substantial evidence and is in accordance with the law.

## STATEMENT PURSUANT TO RULE 56.2

### I. Administrative Determination Under Review

Plaintiffs challenge aspects of the final results of Commerce's administrative review of the countervailing duty order covering CTL plate from Korea. *See Certain Cut-to-Length Carbon-Quality Steel Plate From the Republic of Korea: Final Results of Countervailing Duty Administrative Review; 2023,* 91 Fed. Reg. 8,180 (Dep't Commerce Feb. 20, 2026) (Final Results) (P.R.8)[1], and accompanying Issues and Decision Memorandum. (IDM) (P.R 9). The period of review is January 1 to December 31, 2023.

### II. Issues presented for Review

1. Whether Commerce's determination that the provision of electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) is supported by substantial evidence and is otherwise in accordance with law.

2. Whether Commerce's inclusion of accumulated fuel costs from 2021-2022 in its calculation of the benefit for the provision of electricity for LTAR program is supported by substantial evidence and in accordance with the law.

---

[1] P.R. and C.R. refer to the public and confidential administrative record.

## STATEMENT OF FACTS

On April 9, 2024, Commerce initiated this administrative review. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 24,780 (Dep't Commerce Apr. 9, 2024) (P.R. 266). Commerce selected Dongkuk Steel Mill Co., Ltd. (DSM) and Hyundai Steel as the mandatory respondents. Commerce also sent the GOK the initial questionnaire, requesting information regarding the GOK's alleged provision of electricity for LTAR. *See* Memorandum, "Respondent Selection," dated June 12, 2024; *see also* Commerce's Letter, "Initial Questionnaire," dated June 12, 2024 (Initial Questionnaire).

On August 9, 2024, Hyundai Steel submitted initial questionnaire responses addressing, among other matters, the alleged provision of electricity for LTAR. *See* Hyundai Steel's Letters, "Hyundai Green Power's Initial Questionnaire Response," dated August 9, 2024 (HGP IQR) (P.R. 211-216) (C.R. 297-308); and "Hyundai ITC's Initial Questionnaire Response," dated August 9, 2024 (Hyundai ITC IQR) (P.R. 205-210) (C.R. 284-296).[2] On August 14, 2024, the GOK and Hyundai Steel submitted initial questionnaire responses also addressing, in part, the alleged provision of electricity for LTAR. *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Response to the Initial Questionnaire" at 17–57 (Aug. 14, 2024) (GOK IQR), (C.R. 146–68), (P.R.144–57); Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Hyundai Steel's Initial Questionnaire Response" at 48–49 and Ex. G-1 (Aug. 14, 2024) (Hyundai Steel's IQR), C.R. 59–145); (P.R. 106–43).

The GOK provided information concerning Korea's electricity tariff system, the applicable electricity rates during the POR, and the process for establishing and revising those

[2] In this review, consistent with prior administrative reviews, Commerce continued to find that Hyundai Green Power Co., Ltd (HGP) and Hyundai ITC are cross owned entities under 19 C.F.R. § 351.525(b)(6)(vi). *See* PDM at 6.

rates. *See* GOK IQR at 18–23, 45–54, Ex. E-3–E-6, E-8, and E-9. According to this information, in 2021, as part of the cost pass-through tariff system, two components of the electricity tariff rates were introduced—the Fuel Cost Adjustment Charge (FCAC) and the Climate and Environmental Related Charge (CERC). *Id.* at 18-19, 21, 26 and Exhibits E-9, E-12, and E-19. Both operate outside of the tariff rate adjustment process and are invoiced as separate items on a customer's bill. *Id.* The GOK reported that, in 2023, Korea Electric Power Corporation's (KEPCO) implemented a new methodology for calculating the FCAC. *See* GOK IQR at 19–20; *see also* GOK First SQR at 2–3. The GOK explained that, prior to 2023, when adjustments to the Base Fuel Cost were partial or delayed, the FCAC was calculated regardless of whether the Base Fuel Cost was reflected in the electricity bill. *See* GOK IQR at 19; *see also* GOK February 18, 2025 SQR at 3. Under the new methodology, the FCAC is calculated by applying the Base Fuel Cost less the unadjusted portion. *See* GOK IQR at 19; *see also* Letter from Yoon & Yang LLC to Sec'y Commerce, "Response to the Supplemental Questionnaire" at 3 (Feb. 18, 2025) (GOK First SQR) (C.R. 52–56); (P.R.81–83).

In response to Commerce's supplemental questionnaire, the GOK provided additional information concerning KEPCO's costs and electricity tariff calculations. GOK Response to Supplemental Questionnaire at Ex. E-16.1 and E-23 (P.R.81-83) (C.R.55). The GOK submitted a procedures report concerning KEPCO's 2023 total comprehensive cost and cost data for Commerce's cost-recovery analysis. *Id.* at Ex. E-16.1 and E-23.1. The GOK also submitted procedures reports concerning amounts subject to fuel-cost adjustment settlements for 2021 and 2022. *Id.* at Exs. E-21 and E-22. The GOK reported that, within the 2023 cost data, accumulated fuel costs from 2021 and 2022 were included in the [ ] account, which is not an operating cost. *See* GOK First SQR at 4–8.

On June 12, 2025, Commerce published its preliminary results. *See Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Preliminary Results and Partial Rescission of Countervailing Duty Administrative Review; 2023,* 90 Fed. Reg. 24,776 (Dep't of Commerce June 12, 2025), (P.R. 45) (preliminary results), and accompanying preliminary decision memorandum (P.R. 46) (PDM). Commerce preliminarily determined that KEPCO's provision of electricity to DSM, Hyundai Steel, and Hyundai IFC constituted a financial contribution and conferred a benefit. PDM at 27-35. Commerce found that KEPCO constituted an "authority" under 19 U.S.C. § 1677(5)(B) of the Act and that its provision of electricity constituted a financial contribution in the form of the provision of a good under 19 U.S.C. § 1677(5)(D)(iii). *Id.* at 30–31. Because KEPCO was the dominant electricity provider in Korea and the GOK regulated its electricity tariff rates, Commerce determined that there were no actual market-determined prices in Korea, nor world market prices that would provide an appropriate tier one or tier two benchmark under Commerce's regulations. Thus, Commerce applied a tier three analysis, pursuant to 19 C.F.R. § 351.511(a)(2)(iii), to assess whether KEPCO's electricity prices were consistent with market principles. *Id.* at 31–33.

Based on its comparison of the respondents' industrial electricity rates with KEPCO's reported 2023 cost data, Commerce preliminarily determined that the rates did not recover the costs of supplying electricity and a reasonable return on investment, and thus the rates conferred a benefit under section 771(5)(E)(iv) of the Act. *Id.* at 34–35. Commerce also preliminarily determined that the program was *de facto* specific because, based on an analysis of two sets of electricity consumption data submitted by the GOK, the steel industry received a disproportionately large amount of the subsidy. *Id.* at 35; *see also* Memorandum, "Specificity

Analysis of Industrial Electricity Consumption" at 2 (June 5, 2025) (C.R. 27) (P.R. 49) (Specificity Mem).

On August 19, 2025, GOK and Hyundai Steel submitted case briefs challenging Commerce's preliminary determinations. *See* Letter from Yoon & Yang LLC to Sec'y Commerce, "Case Brief of the Government of the Republic of Korea" (Aug. 19, 2025) (GOK's Case Brief), (C.R. 5); (P.R. 27); Letter from Morris, Manning & Martin, LLP to Sec'y Commerce, "Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea, Case No. C-580-837: Hyundai Steel's Case Brief" (Aug. 19, 2025) (Hyundai Steel's Case Brief), (C.R. 4); (P.R. 26). The GOK and Hyundai Steel challenged Commerce's *de facto* specificity determination and argued that in its market principles analysis for determining the existence of a benefit, Commerce should exclude the fuel costs carried forward from 2021 and 2022 from its 2023 cost-recovery analysis. *See* GOK Br. at 13–16, 16–26; Hyundai Steel's Br. at 4–16. They maintained that including those costs in the 2023 data would result in double counting because the costs had already been included in KEPCO's costs for the years in which they were incurred.

In the final results, Commerce continued to determine that the GOK's provision of industrial electricity for LTAR was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III), because the steel industry received a disproportionately large amount of the subsidy. IDM at 19–27. Commerce continued to rely on the two sets of industrial electricity consumption data submitted by the GOK, which showed that the steel industry consumed more electricity than the average industry and the majority of other industries in Korea during the POR. *Id*. Commerce explained that electricity consumption provided a reasonable measure of the subsidy received because the benefit conferred under the program was directly tied to the quantity of electricity

purchased. *Id.* Commerce therefore continued to find that the record supported its determination that the electricity program was *de facto* specific.

Commerce also rejected the GOK's argument that unrecovered fuel costs from 2021 and 2022, which were not passed through to consumers and are recorded in the [ ] account within KEPCO's 2023 Total Comprehensive Cost, rather than as 2023 operating costs, warranted excluding those costs from the POR cost-recovery analysis or otherwise precluded a finding that the electricity tariffs conferred a benefit. IDM at 9–15; *see also* GOK First SQR at 4–8. Commerce explained that it had considered the GOK's cost pass-through tariff system and the tariff increases implemented during 2023 in evaluating both KEPCO's price-setting methodology and its actual cost recovery. *Id.* Commerce nevertheless found that KEPCO's industrial electricity tariffs failed to recover costs, including a reasonable rate of return, during the POR. *Id.* Commerce further explained that its adequacy-of-remuneration analysis evaluates whether electricity was provided for LTAR during the period of review and does not depend on whether KEPCO might recover unrecovered costs or earn a reasonable return in the future. *Id.* Accordingly, Commerce continued to determine that the GOK's provision of industrial electricity conferred a countervailable benefit during the POR. *Id.*; *see also* Memorandum, "Final Calculations for Hyundai Steel Company" at Attachment II (Feb. 17, 2026) (C.R. 1–2; P.R. 5) (Final Calculation Memorandum).

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's finding that GOK's provision of electricity for LTAR was *de facto* specific because it is supported by substantial evidence and otherwise in accordance with law. Section 1677(5A)(D)(iii)(III) permits Commerce to find a subsidy *de facto* specific when an industry receives a disproportionately large amount of the subsidy. Because the

statute does not prescribe a specific methodology for determining disproportionality, Commerce may employ a reasonable, case-specific methodology based on the record evidence. Commerce reasonably determined that the steel industry received a disproportionately large amount of the electricity subsidy based on two datasets of industrial-class electricity consumption. Unrebutted record evidence showed that the steel industry consumed more electricity than the average of the ten largest industrial electricity consumers and more than hundreds of other industries in Korea. The data also revealed an appreciable difference between the steel industry's consumption, together with that of two or three other major consumers, and the substantially smaller shares consumed by the remaining industries among the ten largest consumers. Commerce thus demonstrated that the steel industry's consumption was disproportionate relative to that of the majority of other industries, rather than merely establishing that the steel industry was a large electricity consumer.

Commerce reasonably found industrial electricity consumption to be an appropriate measure of disproportionality. Under this LTAR program, the benefit conferred is directly tied to the volume of electricity purchased. Moreover, KEPCO's tariff-setting process allocates costs among different user classes, and the consumption levels of the largest industrial users significantly affect industrial electricity costs and pricing. Accordingly, electricity consumption provided a reasonable basis for comparing the relative benefits received by different industries. Considering Korea's highly diversified economy, which includes 19 distinct industry groupings, Commerce reasonably determined that the steel industry received a disproportionate share of the subsidy because its consumption exceeded the average consumption of the ten largest industrial consumers and that of the majority of other industries. Thus, Commerce's analysis demonstrated not merely that certain industries collectively consumed a large share of industrial electricity, but

that the steel industry itself received a disproportionately large amount of the subsidy within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(III).

Commerce's decision to include in its benefit determination the full cost pass-through charges and accumulated fuel costs in its cost-recovery analysis is also supported by substantial evidence and in accordance with law. The FCAC and CERC were integral components of the electricity tariffs paid by consumers during the POR. To reflect the full price of electricity, those costs had to be included in the benefit calculation. Although Hyundai Steel and GOK argue that accumulated fuel costs from 2021 and 2022 had already been included in prior reviews and were not costs incurred during the POR, these costs were incorporated into KEPCO's 2023 Total Comprehensive Cost and informed the tariff rates established during the POR. Because Commerce's tier-three analysis required determining whether the 2023 tariffs allowed KEPCO to recover its costs and earn a reasonable return, Commerce reasonably retained these costs in its analysis. The inclusion of the accumulated fuel from 2021 and 2022 in KEPCO's 2023 cost data did not constitute double counting but ensured that the benefit calculation reflected the full electricity tariff and the costs relevant to cost recovery during the period of review.

## ARGUMENT

### I. Standard of Review

This Court sustains any determination, findings, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 217 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of

drawing inconsistent conclusions does not make Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Com*. 383 U.S. 607, 620 (1966). A party challenging an agency determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotation omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984).

## II. Commerce's Determination that KEPCO's Provision of Electricity for LTAR Is *De Facto* Specific Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law

### A. Legal Framework

Under 19 U.S.C. § 1677(5A)(D)(iii), a domestic subsidy may be specific as a matter of fact if one or more of the following factors are present:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
> (II) An enterprise or industry is a predominant user of the subsidy.
> (III) An enterprise or industry receives a disproportionately large amount of subsidy.
> (IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

When evaluating these factors, Commerce shall "take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation." *Id.* Furthermore, in applying 19 U.S.C. § 1677(5A)(D)(iii)(III), Commerce must assess the extent to which a subsidy is specific by comparing the benefits conferred under the program against an appropriate comparator in light of the particular facts and circumstances of the case. *Hyundai*

*Steel Co. v. United States*, 745 F. Supp. 3d 1345, 1352-53 (Ct. Int'l Trade 2024) (*Hyundai Steel I*); *see also AK Steel Corp. v. United States*, 192 F.3d 1367, 1384–85 (Fed. Cir. 1999). The specificity inquiry does not lend itself to a rigid mathematical formula, rather, Commerce must exercise judgment and balance the relevant factors based on the record evidence. *AK Steel*, 192 F.3d at 1385 (quoting *Countervailing Duties; Notice of Proposed Rulemaking and Request for Public Comments*, 54 Fed. Reg. 23,366, 23,368 (Dep't of Commerce May 31, 1989)). Although Commerce may compare relative percentages rather than absolute amounts, it must employ a reasonable methodology and explain why the respondent or group received more than its fair share of the subsidy in relation to the chosen comparator. *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006) (discussing *AK Steel*, 192 F.3d at 1385). The Federal Circuit has consistently affirmed Commerce's "reasonable flexibility in carrying out the *de facto* specificity inquiry." *Mosaic Co. v. United States*, 160 F.4th 1340, 1347 (Fed. Cir. 2025); *see also Gov't of Quebec v. United States*, 105 F.4th 1359, 1374 (Fed. Cir. 2024) (recognizing Commerce's latitude to select appropriate comparator groups when determining whether a subsidy is specific under 19 U.S.C. § 1677(5A)(D)(iii)(I)).

The specificity requirement serves as a screening mechanism to distinguish subsidies that are broadly available and widely used throughout an economy from those that warrant the imposition of countervailing duties. Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (SAA), H.R. Doc. No. 103-316, vol. 1, at 929–30 (1994). Accordingly, under 19 U.S.C. § 1677(5A)(D)(iii), Commerce must examine the actual distribution and use of a subsidy to determine whether, notwithstanding its facial availability, the subsidy is effectively limited to certain enterprises or industries. *See* SAA at 930–31.

### B. Substantial Evidence Supports Commerce's Determination That the Steel Industry Consumed A Disproportionately Large Amount of the Subsidy

Commerce reasonably determined that the steel industry received a disproportionately large amount of the electricity subsidy. Commerce must assess whether an industry received a disproportionately large amount of a subsidy by comparing the benefit it received against that of other industries or enterprises, regardless of whether the industries are related. 19 U.S.C. § 1677(5A)(D)(iii)(III); *see also* IDM at 24. Because disproportionality concerns whether a benefit is unusually large relative to the benefits received by others, comparative evidence must be evaluated in light of the nature of the subsidy and the circumstances of the program. *AK Steel,* 192 F.3d at 1385.

Commerce relied on two separate datasets of industrial-class electricity consumption provided by the GOK to determine whether the steel industry received a disproportionately large share of the electricity subsidy during the POR. *See* Electricity Specificity Memorandum (ESM) at 2 (P.R. 49); (C.R.27); IDM at 24. Both datasets demonstrated that the steel industry's electricity consumption in 2023 exceeded the average industrial-class electricity consumption of the ten largest electricity-consuming industries, measured as a proportion of total electricity consumption in Korea and within the industrial classification, thereby providing an appropriate basis for comparison. ESM at 2; *see also* GOK IQR at 44-45; and GOK's Letter, "Response to the Supplemental Questionnaire," dated May 12, 2025, at 3-4 (GOK May 12, 2025 SQR) (P.R.49); C.R. 27). The data further showed that the steel industry and only two or three other industries, depending on the dataset, accounted for substantially greater shares of industrial electricity consumption than the remaining industries among the ten largest consumers. ESM at 3 and Attachment; IDM at 24–25. Because the steel industry ranked among the largest industrial

electricity consumers, its consumption also exceeded that of hundreds of other industries in Korea during the POR. *Id.*; *see also* IDM at 24.

Commerce concluded that these comparisons demonstrated disproportionality because the amount of the subsidy conferred under the LTAR program is directly tied to the volume of electricity purchased. ESM at 1. Unlike a program providing a fixed discount or benefit independent of consumption, the electricity for LTAR program confers a benefit through the price charged for the electricity purchased, such that the amount of the subsidy varies with the quantity consumed. IDM at 26. Accordingly, industrial-class electricity consumption provides a reasonable measure of the subsidy conferred on each industry, permitting Commerce to evaluate the usage of the program by comparing consumption levels across industries. IDM at 24; PDM at 33-34.

Hyundai and the GOK challenge Commerce's determination on the basis that electricity is broadly available throughout Korea, all industrial users are subject to the same tariff structure, and argue that, therefore, differences in consumption do not establish that the steel industry received a disproportionately large amount of the subsidy. Hyundai Br. at 11–12; GOK Br. at 5. They further contend that Commerce's comparisons establish only that some industries consume more electricity than others, without identifying the applicable differences necessary to determine whether the steel industry received more than its fair share relative to an appropriate baseline. *Id.* 12-13; GOK Br. at 5 (citing *Hyundai Steel I,* 745 F. Supp. 3d at 1351); *Hyundai Steel Co. v. United States*, 798 F. Supp. 3d 1283 (Ct. Int'l Trade 2025) (*Hyundai Steel II*). Hyundai also argues that Commerce erred in relying upon Korea's economic diversification without adequately connecting that factor to its disproportionality finding. Hyundai Br. at 17–18.

These arguments fail to acknowledge the program's usage-based structure and Commerce's comparative analysis. Commerce did not infer disproportionality merely from the fact that the steel industry consumes substantial amounts of electricity. Rather, it considered the relationship between electricity consumption and benefit incurred and evaluated the steel industry's consumption against that of the largest industrial electricity consumers. ESM at 1–3; IDM at 25–26.

The GOK characterizes Commerce's analysis as conflating disproportionality with disparity. GOK Br. at 5; 8. But, disproportionality exists when something is too large or too small in relation to something else. IDM at 24. Because the electricity for LTAR program confers a benefit through the price charged for electricity, the amount of the subsidy varies directly with the quantity purchased, such that industries consuming more electricity receive a greater benefit. IDM at 24–26; ESM at 1-3. Accordingly, Commerce reasonably compared electricity consumption across industries to determine whether the steel industry's receipt of the subsidy was disproportionate, rather than merely observing that it received a larger absolute benefit.

The fact that only two or three other industries exhibited similarly high consumption does not undermine Commerce's conclusion. The datasets showed that the steel industry and those few industries accounted for substantially greater shares of industrial electricity consumption than the remaining industries among the ten largest consumers. ESM at 3 and Attachment; IDM at 24–25; *see also* Hyundai Br. at 14. This concentration provided additional evidence that the steel industry's consumption was not merely representative of consumption across the major industrial users, but that the subsidy disproportionally benefited Hyundai Steel.

Considered alongside the program's usage-based benefit, the disparity supported Commerce's conclusion that the steel industry received a disproportionately large amount of the subsidy.

Hyundai Steel's reliance on *POSCO v. United States*, 794 F. Supp. 3d 1402, 1410 (Ct. Int'l Trade 2025), is misplaced. In *POSCO,* the Court found that Commerce's grouping was arbitrary where Commerce relied exclusively on broad aggregate volume across a three-industry group. Commerce explicitly declined to assess whether the subsidy received by the Korean steel industry aligned with its electricity usage. By contrast, Commerce's determination here rested on two datasets and a comparative assessment of the steel industry's consumption in the context of the electricity for LTAR program. ESM at 1–3 and Attachment; IDM at 24, 26–27. Commerce explained why consumption was relevant to the amount of the benefit and found that the steel industry's consumption exceeded the average among the ten largest industrial electricity consumers while substantially exceeding that of most other industries in that group. *Id.* Thus, Commerce did not rely solely on the steel industry's status as a large electricity consumer; it assessed the relative distribution of consumption considering the program's mechanics.

Moreover, *Bethlehem Steel* and *Samsung Electronics I* do not preclude Commerce's determination here because neither decision involved the same relationship between the subsidy and the quantity of the subsidized good consumed. *See* Hyundai Br. 16-17. In *Bethlehem Steel*, the Court sustained Commerce's determination that the Voluntary Curtailment Adjustment (VCA) program was not *de facto* specific, even though the steel industry received more than 51 percent of the program's benefits. *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354, 1367–69 (Ct. Int'l Trade 2001). Under the VCA program electricity users received identical price discounts in exchange for agreeing to limit consumption, and Commerce found no record evidence that the steel industry's share of those discounts was disproportionate to its substantial

electricity use. *Id.* at 1368–69. Critically, the VCA program provided a fixed discount, whereas the electricity for LTAR program confers a benefit through the price charged for each unit of electricity purchased. Under the latter program, the amount of the subsidy necessarily varies with consumption, making comparative electricity consumption directly relevant to assessing the relative benefits received by different industries. Commerce did not rely upon pricing "disparity alone." *Bethlehem Steel*, 140 F. Supp. 2d at 1369; *see* IDM at 25–26; ESM at 1.

The GOK similarly mischaracterizes Commerce's analysis when arguing that Commerce assumes industries with different sizes and operational requirements should consume comparable amounts of electricity. GOK Br. at 7 (citing *Bethlehem Steel*, 140 F. Supp. 2d at 1369). Commerce made no such assumption; it used consumption data to evaluate the relative benefits conferred under a program in which the amount of the benefit depends on the quantity purchased.

*Samsung Electronics Co. v. United States*, 973 F. Supp. 2d 1321, 1326–28 (Ct. Int'l Trade 2014) is similarly distinguishable. *See* Hyundai Br. 16-17. There, the Court remanded Commerce's disproportionality analysis because Commerce compared Samsung's tax-credit benefits with the average benefit received by other beneficiaries without adequately accounting for the program's standard mechanism and the relationship between the credits and eligible expenditures. Although the Court emphasized that disproportionality must be assessed in light of "all the facts and circumstances of a particular case," *id.* at 1325 (quoting *AK Steel Corp.* 192 F.3d at 1385), it did not hold that comparative usage is an impermissible measure of disproportionality for a usage-based subsidy. On the contrary, the decision underscores the need to account for the aspects of the subsidy program itself when assessing whether a subsidy is disproportionate. *Id.* at 1327. Commerce did so here by explaining that the electricity for LTAR

subsidies varies with the quantity purchased and by comparing industrial electricity consumption to evaluate the relative subsidy amounts conferred. IDM at 24–26. Therefore, neither *Bethlehem Steel* nor *Samsung Electronics* undermines Commerce's reasoned explanation for its determination.

The GOK cites *Changzhou Trina Solar Energy Co. v. United States*, 352 F. Supp. 3d 1316, 1330 (Ct. Int'l Trade 2018) for the proposition that Commerce must compare the industries receiving a subsidy with the overall industry composition of the country to avoid imposing countervailing duties on subsidies that provide widespread economic benefits. GOK Br. at 5–6. But Commerce found the subsidy at issue in *Trina Solar* to be *de facto* specific under a different provision of the statute (19 U.S.C. § 1677(5A)(D)(iii)(I)) because the recipients of the subsidy were limited in number. Thus, *Trina Solar* does not establish that Commerce's comparative consumption analysis here was unreasonable. Here, Commerce examined the steel industry's electricity consumption against that of other industrial users using two separate datasets and considered Korea's broader economic composition. ESM at 2–3 and Attachment; IDM at 23–25. This analysis went beyond simply counting industries or observing that the steel industry consumed a large amount of electricity. Commerce evaluated the distribution of industrial electricity consumption in the context of a program under which the subsidy varies with the quantity purchased. Moreover, the fact that the electricity program was available to multiple industries does not establish that its benefits were widely distributed throughout Korea's economy. GOK Br. at 6. The relevant question was whether the amount of the subsidy received was disproportionate, not merely whether multiple industries could participate in the program.

Finally, Hyundai Steel mischaracterizes Commerce's consideration of Korea's economic diversification. Hyundai Br. at 17–18. Commerce considered diversification, together with the

consumption data, to assess the steel industry's relative use of the subsidy. Korea Economic Diversification Memorandum (KEDM) at 3–4 (P.R. 252); IDM at 23, 25–26. The memorandum identified 19 industry groupings encompassing a broad range of economic activities, providing context for Commerce's assessment of the steel industry's electricity consumption. *Id.* Hyundai Steel's reliance on differences in the number of establishments across industries does not undermine that analysis. The statutory inquiry concerns whether an industry received a disproportionately large amount of the subsidy, not whether industries contain equal numbers of establishments. *See* 19 U.S.C. § 1677(5A)(D)(iii)(III). Nor does the fact that some industries do not consume industrial-class electricity invalidate Commerce's comparison of the steel industry with other industrial electricity consumers. IDM at 24. Commerce used GOK's industry-classification data to assess relative consumption and considered economic diversification as contextual evidence for its specificity finding. Commerce did not treat diversification as a substitute for the statutory disproportionality analysis.

Accordingly, the Court should sustain Commerce's determination that the steel industry received a disproportionately large share of the subsidy as supported by substantial evidence and in accordance with law.

### C. Commerce's Determination to Group Certain Industries for Purposes of Its Disproportionality Analysis is Reasonable.

Hyundai Steel argues that Commerce arbitrarily grouped the steel industry with two unrelated industries based on their status as the three largest consumers of industrial electricity. Hyundai Br. at 18–20. Hyundai Steel contends that Commerce's explanation, that the industries consumed relatively comparable percentages of total industrial electricity, does not establish a rational basis to treat them as a group in its disproportionality analysis. *Id.* Specifically, Hyundai Steel argues that 19 C.F.R. § 351.502(b), which provides that Commerce need not

identify shared characteristics among industries receiving a subsidy, does not authorize Commerce to group industries without a reasoned explanation.

Hyundai Steel diminishes Commerce's reasoning. Commerce did not invoke 19 C.F.R. § 351.502(b) as a substitute for providing a rational basis for grouping industries in its disproportionality analysis. Section 351.502(b) confirms that Commerce need not establish that grouped industries share common characteristics but that the relevant question is whether Commerce has an evidentiary basis for its grouping, not whether the selected industries operate in related sectors.

Here, Commerce did not arbitrarily aggregate unrelated industries based solely on their status as the three largest consumers of industrial electricity. Rather, Commerce grouped the industries because of record evidence that each industry received a disproportionately large share of the benefit, as measured by industrial electricity consumption, compared with the majority of industries identified in the relevant consumption datasets. IDM at 25; *see also* ESM at 3 and attachment. The common feature supporting the grouping was not the industries' business activities, production processes, or other shared characteristics, but their comparatively large consumption of industrial electricity and, consequently, their receipt of a disproportionately large share of the subsidy associated with the provision of electricity for LTAR. This approach is consistent with *Mosaic,* which recognizes Commerce's flexibility in selecting comparator groups, subject to reasoned decision-making. *Mosaic,* 160 F.4th at 1346-47. Commerce was not required to select industries based on their business relationships or shared characteristics when the consumption data provided a relevant basis for comparison. *POSCO,* 794 F. Supp. 3d at 1408. The absence of such characteristics therefore does not, by itself, render Commerce's grouping arbitrary.

We recognize that in *Hyundai III,* this Court found that Commerce had not adequately explained either how its comparator measured disproportionality or why the selected industries constituted an appropriate group based upon the record in that dispute. *Hyundai Steel Co. v. United States*, No. 24-00190, 2026 WL 2585633, at *6 (Ct. Int'l Trade Aug. 11, 2026). However, this Court did not reject Commerce's flexibility to select comparator groups—and accordingly the analysis applied in this record; it required a reasoned explanation connecting the group to the disproportionality analysis as has been provided here. *Id.*

Unlike in *Hyundai III* where Commerce relied merely on the top-ranking large consumers without additional rationale, Commerce's analysis in this case is grounded in the comparative consumption data identified in the record, which demonstrates that each selected industry accounted for a disproportionately large share of industrial electricity consumption relative to most other industries. IDM at 25; *see also* ESM at 3 and attachment. This underlying distribution data establishes an objective economic basis for the grouping beyond simple consumption rankings, satisfying the requirement for a discernable explanation under *State Farm*. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 43 (1983). Much like plaintiffs' other arguments, here both the distinct circumstances and Commerce's cumulative analysis differentiate this case from plaintiffs' comparison. Accordingly, the Court should reject Hyundai Steel's arguments and find that Commerce's decision to group these industries together for the disproportionality analysis is reasonable and supported by substantial evidence.

**D. Commerce Calculation of the Benefit for the Electricity for LTAR Program Is Supported by Substantial Evidence and Is Otherwise in Accordance with Law**

Commerce's inclusion of accumulated fuel costs from 2021 and 2022 in its 2023 cost-recovery analysis is supported by substantial evidence and is otherwise in accordance with law .

Under 19 C.F.R. § 351.511(a)(2)(iii), Commerce examines whether government prices are consistent with market principles. In conducting that analysis, Commerce evaluates the extent to which government pricing reflects market conditions, including whether electricity tariffs permit the supplier to recover its costs. IDM at 19. Commerce reasonably concluded that KEPCO's 2023 cost data, including the accumulated fuel costs, were relevant to that inquiry because those costs were incorporated into Total Comprehensive Cost and informed the tariff rates established during the POR. *Id* at 17-19.

Commerce also reasonably included the FCAC and the CERC in calculating the benefit. Both charges are components of Korea's electricity tariff, which consists of the Base Charge, Energy Charge, CERC, and FCAC. GOK IQR at Ex. E-9; IDM at 17–18. Neither the FCAC nor the CERC represented a new or additional charge; rather, both were previously included in the electricity tariff and were separated from the Energy Charge as independent components in 2021. GOK IQR at 18–20; GOK February 18, 2025 SQR at 2–4; Preliminary Results PDM at 29. As KEPCO explained, the cost pass-through tariff system was implemented to strengthen the relationship between the costs KEPCO incurred and the tariffs it charged customers and to improve transparency by separately billing fuel and climate-related costs. GOK IQR at Ex. E-2 (KEPCO's 2024 Form 20-F filing with the U.S. Securities and Exchange Commission) at 5. Commerce therefore reasonably treated the FCAC and CERC as components of the full electricity price paid by consumers, rather than excluding them from its benefit calculation. IDM at 17–19.

Plaintiff argues that Commerce's inclusion of accumulated fuel costs from 2021 and 2022 constitutes improper double-counting of costs already addressed in prior administrative reviews. Hyundai Br. at 21–24 (citing *Hyundai Steel IV*, No. 24-cv-00190-CRK, slip op. (Aug. 11, 2026)).

This argument misapprehends both the nature of KEPCO's rolling regulatory accounting and the mechanics of Commerce's cost-recovery benchmark. The accumulated fuel costs from 2021-2022, which were not passed through to consumers, are recorded in the [ ] account which appears in KEPCO's 2023 Total Comprehensive Cost. GOK First SQR at 4–8. KEPCO's tariff system permits unrecovered fuel costs to be accumulated and rolled into the Total Comprehensive Cost denominator, which directly dictates the Base Charges and Usage Charges levied during the POR. IDM at 18–19. KEPCO's 2024 Form 20-F confirms that Total Comprehensive Cost incorporates relevant costs from prior-year settled accounts to establish subsequent operating tariff rates. *Id.* at 18. Thus, Commerce did not arbitrarily import historical costs into 2023; rather, it found that these accumulated costs were an operative, legally mandated component of KEPCO's 2023 cost base that actively informed the prices Hyundai Steel paid. *Id.* at 19.

Accounting for these accumulated fuel costs for 2021 and 2022 in Commerce's analysis of KEPCO's 2023 cost-recovery does not constitute double-counting or duplicate the subsidy calculations from the 2021 and 2022 reviews. In prior reviews, Commerce measured the adequacy of remuneration by looking at KEPCO's unrecovered costs for those specific review periods to determine the extent of whether KEPCO recovered its plus a reasonable rate of return when establishing electricity rates for the relevant period. For 2023, the inquiry is entirely distinct: Commerce is evaluating whether KEPCO fully recovered its operating realities during 2023. *See* IDM at 15-19. Because KEPCO's actual financial statements for 2023 structurally incorporate the realization and settlement of past unrecovered accounts through the pass-through mechanism, excluding them would artificially distort KEPCO's true cost-recovery picture for the current POR, creating an inaccurate benchmark for adequacy of remuneration. IDM at 18–19;

*see also CTL Plate from Korea 2022* Final IDM at Comments 1 and 4 (noting Commerce previously rejected identical arguments regarding 2021 accumulated fuel costs).

None of the authorities relied upon by Hyundai Steel establish that Commerce must disregard prior-period costs that affect the prices charged during the POR. The provision of goods regulation, 19 C.F.R. § 351.511(b), identifies when a benefit normally is received in the government provision of a good; it does not prohibit Commerce from considering historical costs that remain relevant to the pricing mechanism under review. In *Canadian Solar* the Court addressed how to prevent the government from collecting too much in countervailing duties when companies increase the price of goods through sales between affiliated companies before the goods are imported into the United States. *Canadian Solar v. United States*, 537 F. Supp. 3d 1380, at 1395–97 (Ct. Int'l Trade 2021). The Court's analysis focused on reviewing sales invoices, identifying price increases between affiliated companies, and examining customs values to ensure that the duties collected reflected the actual amount of the subsidy. *Id.* This case involves a different issue. Rather than examining price increases between affiliated companies, Commerce is evaluating whether KEPCO's electricity rates during the period of review were sufficient to cover its operating costs and provide a reasonable return on its investments. IDM at 17–19.

Furthermore, Commerce did not simply attribute the 2021 and 2022 costs to 2023 because they were incurred in earlier years, but found that KEPCO's tariff methodology incorporated those unrecovered costs into its 2023 Total Comprehensive Cost, and that they affected the rates charged during the POR. IDM at 18–19. Commerce's approach therefore reflects the actual operation of KEPCO's tariff system rather than expansion of the period of review.

Nor does *Uttam Galva Steels Ltd. v. United States*, 311 F. Supp. 3d 1345 (Ct. Int'l Trade 2018), support Hyundai Steel and the GOK's double-counting argument. In *Uttam Galva*, Commerce made an additional adjustment to normal value for import duties that its original calculation had already accounted for, thereby counting the same duties twice and effectively negating the exporter's statutory duty-drawback adjustment. *Id.* at 1363–65. The Court rejected a duplicative adjustment; it did not prohibit Commerce from considering costs originating outside the period under review. Here, Commerce explained that the accumulated 2021 and 2022 fuel costs were incorporated into KEPCO's 2023 Total Comprehensive Cost and informed the tariffs charged during the POR. IDM at 18–19. Unlike the demonstrably duplicative adjustment in *Uttam Galva*, the inclusion of these costs reflects KEPCO's documented tariff-setting mechanism. The fact that the costs arose in earlier years or were considered in prior reviews does not establish that Commerce counted the same costs twice in calculating the benefit. Instead, it reflects Commerce's efforts to accurately account for countervailing subsidies within the specific period at issue.

In sum, Commerce included the 2021 and 2022 costs because KEPCO's tariff-setting mechanism incorporated those costs into its 2023 Total Comprehensive Cost, which informed the electricity rates charged during the POR. Accordingly, Commerce did not double count KEPCO's accumulated fuel costs, and this Court should sustain Commerce's calculation as supported by substantial evidence and in accordance with to law.

## CONCLUSION

For these reasons, we respectfully request that the Court deny the plaintiffs' motions, sustain Commerce's final results, and enter judgment for the United States.

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. MCCARTHY
Director

TARA K. HOGAN
Assistant Director

MATTHEW D. LEWIS
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
(202) 880-6321

Attorneys for Defendant

OF COUNSEL:

BRAHIM SLEIMAN
U.S. Department of Commerce
Office of the Chief Counsel for Trade
Enforcement and Compliance
Litigation Branch
1401 Constitution Avenue
Washington, D.C. 20230

November 23, 2026

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 6,811 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

/s/ Matthew D. Lewis
MATTHEW D. LEWIS

**CERTIFICATE OF SERVICE**

I hereby certify that, on the 23rd day of November, 2026, I caused the confidential version of the brief filed by defendant, the United States, to be served electronically via the Department of Justice's secured electronic file share service JEFS to the following parties:

Brady Warfield Mills
Donald B. Cameron , Jr.
Edward J. Thomas, III
Eugene Degnan
Jordan L. Fleischer, Jr.
Julie Clark Mendoza
Mary Shannon Hodgins
Nicholas C. Duffey
Rudi Will Planert
Shiyu Liang
Xi Yang

**Taft, Stettinius & Hollister, LLP**
1333 New Hampshire Avenue, NW
Suite 800
Washington, DC 20036

*Counsel for Plaintiff*
*Hyundai Steel Company*

Yujin Kim McNamara
Daniel Martin Witkowski
Jooyoun Jeong
Sung Un K. Kim

**Akin, Gump, Strauss, Hauer & Feld, LLP**
2001 K Street, NW.
Washington, DC 20006

*Counsel for Plaintiff-Intervenor*
*Government of the Republic of Korea*

Christopher Bright Weld
Adam Milan Teslik
Alan Hayden Price
Derick G. Holt

Maureen Elizabeth Thorson
Paul A. Devamithran
Theodore Paul Brackemyre

**Wiley Rein, LLP**
2050 M Street, NW.
Washington, DC 20036

*Counsel for Defendant-Intervenor Nucor Corporation*

/s/ Matthew D. Lewis
MATTHEW D. LEWIS